UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FIREMAN'S FUND INSURANCE COMPANY,

        Plaintiff,

v.

GENERAL REINSURANCE CORP.,

        Defendant.
_____/

No. C-03-4406 JCS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On May 31, 2005, the Court conducted a non-jury trial in the above matter. Pursuant to Federal Rule of Civil Procedure 52(a), the Court hereby makes the following Findings of Fact and Conclusions of Law.

**I.    FINDINGS OF FACT**

    **A.    Background**

        **1.    Basic Principles of Reinsurance**

        1.    "Reinsurance . . . means . . . the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss." 13A Appleman, *Insurance Law & Practice* § 7681 at 480 (1976).

        2.    Reinsurance contracts, referred to as a "certificates," typically are "short and concise, using terms of art rather than lengthy, legalistic explications to define the obligations of the parties." B. Ostrager and M.K. Vyskocil, *Modern Reinsurance Law and Practice*, Section 5.03, p. 5-9 (Glasser Legal Works 2000).

3.      A reinsurance certificate is facultative if it provides reinsurance on part or all of a single insurance policy issued by the cedent, rather than reinsuring multiple policies issued by the cedent in a particular line of business. The latter is referred to as treaty reinsurance.

### 2. The Parties

4.      Plaintiff, Fireman's Fund, is a California corporation with its principal place of business in Novato, California. Joint Statement of Stipulated or Undisputed Facts ("Joint Statement"), ¶ 1.

5.      Defendant, General Reinsurance Corp. ("Gen Re") is a Delaware corporation with its principal place of business in Stamford, Connecticut. Joint Statement, ¶ 2.

6.      Both parties are present and doing business in the Northern District of California. Joint Statement, ¶ 4.

### B. The Facultative Reinsurance Certificates ("the Certificates")

#### 1. Texaco Certificate and Declaratory Judgment ("DJ") Expenses

7.      Fireman's Fund issued a policy of excess liability insurance to Texaco, Inc., policy number XLX 102-76-30, effective January 1969 ("the Texaco Policy"), which provided liability coverage to Texaco for bodily injury and property damage. Joint Statement, ¶ 5; *see* Ex. 200.

8.      Gen Re issued facultative reinsurance certificate number F90121 ("the Texaco Certificate"), effective January 1, 1969, reinsuring a portion of the risk assumed by Fireman's Fund with respect to the Texaco Policy. Joint Statement, ¶ 6; *see* Ex. 2.

9.      The Texaco Certificate includes the following provision:

> C.     All claims involving this reinsurance, when settled by the Company [Fireman's Fund] shall be binding on the Reinsurer [Gen Re], which shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that the Reinsurer's [Gen Re's] loss payment bears to the Company's [Fireman's Fund's] gross loss payment, with respect to business accepted on an excess of loss basis and in the ratio that the Reinsurer's [Gen Re's] limit of liability bears to the Company's [Fireman's Fund's] gross limit of liability with respect to business accepted on a pro rata basis, its proportion of expenses, other than Company [Fireman's Fund] salaries and office expenses incurred by the Company [Fireman's Fund] in the investigation and settlement of claims or suits and, with the prior consent of the Reinsurer [Gen Re] to trial court proceedings, its proportion of court costs and interest on any judgment or award.

Ex. 2.

10. Texaco filed declaratory relief actions against Fireman's Fund seeking coverage under the Texaco Policy for claims made against it by third parties alleging environmental contamination and asbestos injuries. Joint Statement, ¶ 7.

11. Fireman's Fund notified Gen Re of the declaratory relief actions filed by Texaco. Joint Statement, ¶ 8.

12. Fireman's Fund incurred DJ expenses defending against Texaco's claims for coverage under the Fireman's Fund Texaco Policy. Fireman's Fund also paid money to Texaco to settle the coverage issues raised by the declaratory relief actions ("the loss payment"). Gen Re reimbursed Fireman's Fund for Gen Re's proportionate amount of the loss payment. Joint Statement, ¶ 9.

13. On December 6, 1996, Fireman's Fund sent Gen Re two invoices, each in the amount of $15,426.35, seeking reimbursement under the Texaco Certificate of Gen Re's proportionate share of the DJ expenses Fireman's Fund incurred defending against the Texaco declaratory relief actions. These invoices were received by Gen Re on or before December 17, 1996. Joint Statement, ¶ 11; *see* Exs. 201-202.

14. One of the invoices sent on December 6, 1996, is addressed to Gen Re's San Francisco office and states "TOTAL DUE FFIC THIS NOTICE." *See* Ex. 201. The other invoice does not indicate which office it was sent to and does not specify when payment is due. *See* Ex. 202.

15. Fireman's Fund sent Gen Re a third invoice in the amount of $4,282.04 on September 16, 1998, which was received by Gen Re on or before December 17, 1998. Joint Statement, ¶ 12; *see* Ex. 203.

16. The third invoice is addressed to Gen Re's San Francisco offices and states "BALANCE DUE FFIC." *See* Ex. 203.

17. Fireman's Fund sent Gen Re a fourth invoice in the amount of $15,087.00 on February 9, 2000. Joint Statement, ¶ 13; *see* Ex. 204.

18. The fourth invoice is addressed to Gen Re's San Francisco office and states "Net Due on Receipt." *See* Ex. 204.

19. The amount in controversy as to the Texaco DJ expenses is $50,221.74. Joint Statement, ¶ 14.

3

20. Gen Re contends that it is not obligated to pay the Texaco DJ expenses and has not paid any portion of them. Joint Statement, ¶ 15.

### 2. SoCal Edison Certificate and DJ Expenses

21. Fireman's Fund issued a policy of excess liability insurance to Southern California Edison Company ("SoCal Edison"), policy number XLX 104-53-67, effective April 1970 ("the SoCal Edison Policy"), which provided liability coverage to SoCal Edison for bodily injury and property damage. Joint Statement, ¶ 16; *see* Ex. 205.

22. Gen Re issued facultative reinsurance certificate number F99815 ("the SoCal Edison Certificate"), effective April 16,1970, reinsuring a portion of the risk assumed by Fireman's Fund with respect to the SoCal Edison Policy. Joint Statement, ¶ 17; *see* Ex. 3.

23. The SoCal Edison Certificate includes the following provision:

> C.   All claims involving this reinsurance, when settled by the Company [Fireman's Fund] shall be binding on the Reinsurer [Gen Re], which shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that the Reinsurer's [Gen Re's] loss payment bears to the Company's [Fireman's Fund's] gross loss payment, with respect to business accepted on an excess of loss basis and in the ratio that the Reinsurer's [Gen Re's] limit of liability bears to the Company's [Fireman's Fund's] gross limit of liability with respect to business accepted on a pro rata basis, its proportion of expenses, other than Company [Fireman's Fund] salaries and office expenses incurred by the Company [Fireman's Fund] in the investigation and settlement of claims or suits and, with the prior consent of the Reinsurer [Gen Re] to trial court proceedings, its proportion of court costs and interest on any judgment or award.

Ex. 3.

24. SoCal Edison filed declaratory relief actions against Fireman's Fund seeking coverage under the SoCal Edison Policy for claims made against it by third parties alleging environmental contamination. Joint Statement, ¶ 18.

25. Fireman's Fund notified Gen Re of the declaratory relief actions filed by SoCal Edison. Joint Statement, ¶ 19.

26. Fireman's Fund incurred DJ expenses defending against SoCal Edison's claims for coverage under the SoCal Edison Policy. Fireman's Fund also paid money to SoCal Edison to settle the coverage issues raised by the declaratory relief actions. Gen Re reimbursed Fireman's Fund for Gen Re's proportionate amount of the loss payment. Joint Statement, ¶ 20.

27. On December 6, 1996, Fireman's Fund sent to Gen Re three invoices dated November 26, 1996, for a total of $62,378.40, seeking reimbursement under the SoCal Edison Certificate of Gen Re's proportionate share of the DJ expenses Fireman's Fund incurred defending against the SoCal Edison declaratory relief actions. Gen Re received these invoices on or before December 17, 1996. Joint Statement, ¶¶ 21-22; *see* Exs. 206-208.

28. All three invoices are addressed to Gen Re's office in Stamford Connecticut and state "TOTAL DUE FFIC THIS NOTICE." *See* Exs. 206-208.

29. On February 2, 1998, Fireman's Fund faxed to Gen Re revised billings dated February 2, 1998, for a total of $62,577.99. These invoices duplicate the November 26, 1996 invoices and include additional DJ expenses in the amount of $199.59. Joint Statement, ¶ 23; *see* Exs. 209-211.

30. All three revised invoices are addressed to Gen Re's San Francisco office and state "DUE UPON RECEIPT." Exs. 209-211.

31. The agreed upon amount in controversy as to the SoCal Edison DJ expenses is $62,577.99. Joint Statement, ¶ 23.

32. Gen Re contends that is not obligated to pay the SoCal Edison DJ expenses and has not paid any portion of them. Joint Statement, ¶ 25.

### 3. Penn Central Certificate and DJ Expenses

33. Fireman's Fund issued a policy of excess liability insurance to Penn Central Company ("Penn Central"), policy number XLX 105-07-66, effective April 1971 ("the Penn Central Policy"), which provided liability coverage to Penn Central for bodily injury and property damage. Joint Statement, ¶ 26; *see* Ex. 212.

34. Gen Re issued facultative reinsurance certificate number F46024 ("the Penn Central Certificate"), effective April 16, 1971, reinsuring a portion of the risk assumed by Fireman's Fund with respect to the Penn Central Policy. Joint Statement, ¶ 27; *see* Ex. 4.

35. The Penn Central Certificate includes the following provision:

> C. All claims involving this reinsurance, when settled by the Company [Fireman's Fund] shall be binding on the Reinsurer [Gen Re], which shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that the Reinsurer's [Gen Re's] loss payment bears to the Company's [Fireman's Fund's] gross loss payment, with respect to

5

> business accepted on an excess of loss basis and in the ratio that the Reinsurer's [Gen Re's] limit of liability bears to the Company's [Fireman's Fund's] gross limit of liability with respect to business accepted on a pro rata basis, its proportion of expenses, other than Company [Fireman's Fund] salaries and office expenses incurred by the Company [Fireman's Fund] in the investigation and settlement of claims or suits and, with the prior consent of the Reinsurer [Gen Re] to trial court proceedings, its proportion of court costs and interest on any judgment or award.

Ex. 4.

36. Penn Central filed declaratory relief actions against Fireman's Fund seeking coverage under the Penn Central Policy for claims made against it by third parties alleging environmental contamination and other injuries. Joint Statement, ¶ 28.

37. Fireman's Fund notified Gen Re of the declaratory relief actions filed by Penn Central. Joint Statement, ¶ 29.

38. Fireman's Fund incurred DJ expenses defending against Penn Central's claims for coverage under the Fireman's Fund Penn Central Policy. Fireman's Fund also paid money to Penn Central to settle the coverage issues raised by the declaratory relief actions. Gen Re reimbursed Fireman's Fund for Gen Re's proportionate amount of the loss payment. Joint Statement, ¶ 30.

39. Fireman's Fund sent Gen Re an invoice dated May 9, 2000, in the amount of $1,705.86, seeking reimbursement under the Penn Central Certificate of Gen Re's proportionate share of the DJ expenses Fireman's Fund incurred defending against the Penn Central declaratory relief actions. That is the agreed amount in controversy as to the Penn Central DJ expenses. Joint Statement, ¶ 32; *see* Ex. 213.

40. The May 9, 2000 invoice was sent to Gen Re's San Francisco office.

41. Gen Re contends that is not obligated to pay the Penn Central DJ expenses and has not paid any portion of them. Joint Statement, ¶ 33.

**4.   Oil and Solvent Certificate and DJ Expenses**

42. Fireman's Fund issued a policy of excess liability insurance to Oil and Solvent Process Company ("Oil and Solvent"), policy number LC 2431174, effective December 1975 ("the Oil and Solvent Policy"), which provided liability coverage to Oil and Solvent for bodily injury and property damage. Joint Statement, ¶ 34; *see* Ex. 214.

6

43. Gen Re issued facultative reinsurance certificate number FJ 9871-B ("the Oil and Solvent Certificate"), effective December 1977, reinsuring a portion of the risk assumed by Fireman's Fund with respect to the Oil and Solvent Policy. Joint Statement, ¶ 35; *see* Ex. 5.

44. The Oil and Solvent Certificate includes the following provision:

> D.   All loss settlements made by the Company [Fireman's Fund], provided they are within the terms and conditions of the original policy(ies) and within the terms and conditions of this certificate of reinsurance shall be binding on the Reinsurer [Gen Re]. Upon receipt of a definitive statement of loss, the Reinsurer [Gen Re] shall promptly pay its proportion of such loss as set forth in the Declarations. In addition thereto, the Reinsurer [Gen Re] shall pay its proportion of expenses (other than office expenses and payments to any salaried employee) incurred by the Company [Fireman's Fund] in the investigation and settlement of claims or suits and its proportion of court costs and interest on any judgment or award, in the ratio that the Reinsurer's [Gen Re's] loss payment bears to the Company's [Fireman's Fund's] gross loss payment. . . . .

Ex. 5.

45. Waste Management, Inc., a parent corporation of Oil and Solvent, filed a declaratory relief action against Fireman's Fund seeking coverage under the Oil and Solvent Policy for claims made against it by third parties alleging environmental contamination. Joint Statement, ¶ 36.

46. Fireman's Fund notified Gen Re of the Oil and Solvent declaratory relief actions. Joint Statement, ¶ 37.

47. Fireman's Fund incurred DJ expenses defending against Oil and Solvent's claims for coverage under the Fireman's Fund Penn Central Policy. Fireman's Fund also paid money to Waste Management, Inc. and/or Oil and Solvent to settle the coverage issues raised by the declaratory relief actions. Gen Re reimbursed Fireman's Fund for Gen Re's proportionate amount of the loss payment. Joint Statement, ¶ 38.

48. Fireman's Fund sent Gen Re two invoices, both dated September 8, 1999, totaling $67,723.00, seeking reimbursement under the Oil and Solvent Certificate of Gen Re's proportionate share of the DJ expenses Fireman's Fund incurred defending against the Oil and Solvent declaratory relief actions. Gen Re received the invoices on September 23, 1999. Joint Statement, ¶¶ 39-40; *see* Exs. 215-216.

49. The September 8, 1999 invoices both are addressed to Gen Re's San Francisco office and state "DUE UPON RECEIPT." Exs. 215-216.

7

50. Fireman's Fund sent Gen Re two additional invoices, both dated April 12, 2002, in the amounts of $30,233.16 and $55,233.16. Joint Statement, ¶ 41; *see* Exs. 217-218.

51. Both of the April 12, 2002 invoices were addressed to Gen Re's San Francisco office.

52. The agreed upon amount in controversy with respect to the Oil and Solvent DJ expenses is $89,309.36. Joint Statement, ¶ 42.

53. Gen Re contends that is not obligated to pay the Oil and Solvent DJ expenses and has not paid any portion of them. Joint Statement, ¶ 43.

### 5. Chem Trol Certificate and DJ Expenses

54. Fireman's Fund issued a policy of excess liability insurance to Chem Trol Industrial Sales, Inc. ("Chem Trol"), policy number LC 193 83 57, effective September 1972 ("the Chem Trol Policy"), which provided liability coverage to Chem Trol for bodily injury and property damage. Joint Statement, ¶ 44.

55. Gen Re issued facultative reinsurance certificate number FA 2314 ("the Chem Trol Certificate"), effective September 1972, reinsuring a portion of the risk assumed by Fireman's Fund with respect to the Chem Trol Policy. Joint Statement, ¶ 45; *see* Ex. 6.

56. The Chem Trol Certificate includes the following provision:

> D. All loss settlements made by the Company [Fireman's Fund], provided they are within the terms and conditions of the original policy(ies) and within the terms and conditions of this certificate of reinsurance shall be binding on the Reinsurer [Gen Re]. Upon receipt of a definitive statement of loss, the Reinsurer [Gen Re] shall promptly pay its proportion of such loss as set forth in the Declarations. In addition thereto, the Reinsurer [Gen Re] shall pay its proportion of expenses (other than office expenses and payments to any salaried employee) incurred by the Company [Fireman's Fund] in the investigation and settlement of claims or suits and its proportion of court costs and interest on any judgment or award, in the ratio that the Reinsurer's [Gen Re's] loss payment bears to the Company's [Fireman's Fund's] gross loss payment. . . . .

Ex. 6.

57. Waste Management, Inc., a parent corporation of Chem Trol, filed a declaratory relief action against Fireman's Fund seeking coverage under the Chem Trol Policy for claims made against it by third parties alleging environmental contamination. Joint Statement, ¶ 46.

8

58. Fireman's Fund notified Gen Re of the Chem Trol declaratory relief action. Joint Statement, ¶ 47.

59. Fireman's Fund incurred DJ expenses defending against Chem Trol's claims for coverage under the Chem Trol Policy. Fireman's Fund also paid money to Waste Management, Inc. and/or Chem Trol to settle the coverage issues raised by the declaratory relief actions. Gen Re reimbursed Fireman's Fund for Gen Re's proportionate amount of the loss payment. Joint Statement, ¶ 48.

60. Fireman's Fund sent Gen Re an invoice dated April 12, 2002 for $76,594.66, seeking reimbursement under the Chem Trol Certificate of Gen Re's proportionate share of the DJ expenses Fireman's Fund incurred defending against the Chem Trol declaratory relief action. Joint Statement, ¶ 49; *see* Ex. 219.

61. The April 12, 2002 invoice was sent to Gen Re's San Francisco office. *See* Ex. 219.

62. The agreed upon amount in controversy, notwithstanding the April 12, 2002 invoice, is $34,467.60 with respect to the Chem Trol DJ expenses. Joint Statement, ¶ 50.

63. Gen Re contends that is not obligated to pay the Chem Trol DJ expenses and has not paid any portion of them. Joint Statement, ¶ 43.

**D.  Choice of Law**

64. None of the Certificates contains a choice of law provision.

**E.  Timeliness of Claims**

65. In response to invoices from Fireman's Fund that included DJ expenses, Gen Re asked Fireman's Fund why it was required to pay these invoices. *See* Rebuttal Declaration of Earl C. Davis ("Davis Rebuttal Decl."), ¶ 5. Fireman's Fund employees responded by stating Fireman's Fund's position that such expenses were covered under the Gen Re Certificates. *Id*.[1]

---

[1] The Court overrules Gen Re's objections to this testimony. According to Gen Re, Davis has not established that he has personal knowledge of these communications. The Court disagrees. Davis states in his Rebuttal Declaration that "[a]s Senior Vice President of Discontinued Operations and President of SF Re [a wholly owned subsidiary of Fireman's Fund], one of my responsibilities is supervising a staff who present claims for reimbursement to reinsurers that have afforded facultative and treaty reinsurance in favor of Fireman's Fund and Fireman's Fund-related entities." Davis Rebuttal Decl., ¶ 3. Davis's employment in this capacity is sufficient to establish his personal knowledge in this area.

66. Beginning in 1998, Gen Re and Fireman's Fund began discussing the possibility of a global settlement of the outstanding DJ costs. Davis Rebuttal Decl., ¶ 7.[2]

67. Although there were "long lapses in time" between discussions, Fireman's Fund continued to send Gen Re regular billing reminders as to the outstanding DJ expenses. Davis Rebuttal Decl., ¶ 8.

68. In 2003, Senior Vice President of Discontinued Operations Earl Davis became directly involved in the settlement discussions with Gen Re concerning outstanding DJ expenses. Davis Rebuttal Decl., ¶ 10.

69. On March 25, 2003, in response to Gen Re's request, Fireman's Fund provided Gen Re with a spread sheet showing all outstanding DJ expenses Fireman's Fund sought from Gen Re. Davis Rebuttal Decl., ¶ 11.

70. A meeting between representatives of Gen Re and Fireman's Fund (in which Davis participated) was held on March 28, 2003, to discuss the outstanding DJ expenses. The parties were able to agree on the amounts in dispute but were not able to agree on a settlement. Davis Rebuttal Decl., ¶ 17. At the meeting, Davis stated that because the parties were unable to reach a settlement, Fireman's Fund intended to file a lawsuit. Davis Rebuttal Decl., ¶ 18. According to Davis, Gen Re's representative agreed that a lawsuit would be the best way to resolve the dispute and did not raise the possibility that the claims might be time-barred. Davis Rebuttal Decl., ¶ 18.

71. Prior to March 2003, Gen Re did not, to the knowledge of Earl Davis, expressly refuse to pay the DJ expenses. Davis Rebuttal Decl., ¶ 9. Nor is there any other evidence in the record that prior to March 2003 Gen Re expressly refused to pay the DJ expenses.

---

[2] Gen Re objects to this testimony on the basis that evidence of settlement discussions is inadmissible to establish liability under Rule 408 of the Federal Rules of Evidence. The Court overrules this objection. Rule 408 expressly permits evidence of settlement discussions that is offered for a purpose other than establishing liability, such as "negativing a contention of undue delay." F. R. Evid. 408; *see also* 23 Charles Alan Wright, Kenneth W. Graham, Jr., Federal Practice and Procedure § 5312 (explaining that Rule 408 generally permits the use of compromise evidence to account for failure to meet deadlines such as a statute of limitations because "it is the fact of such compromise negotiations, not the details of the various offers, that is relevant to explain delay").

72. In the reinsurance industry, the reinsurer and the insured have a relationship of "utmost good faith." Davis Rebuttal Decl., ¶ 21. "It is not unusual for the parties to a reinsurance contract to conduct their business informally with extensive time lapses between billings and collections." *Id*.

### F.    Custom and Practice

73. The parties disagree as to the prevailing custom in the reinsurance industry at the time the Certificates were issued as to payment of DJ expenses. Fireman's Fund presents evidence that DJ expenses were routinely and knowingly paid by reinsurers. Gen Re disputes that these expenses were routinely paid across the industry, arguing that Fireman's Fund's evidence is based on the practice of a single company. Further, Gen Re argues that even if DJ expenses were routinely paid by reinsurers, payment of those expenses was not knowing.

The Court reviews the evidence of custom and practice below and makes specific credibility findings.

74. Fireman's Fund relies heavily on the testimony of William J. Gilmartin in support of its position. Gilmartin is qualified as an expert witness under Rule 702 of the Federal Rules of Evidence, based on his knowledge, skill and experience in the insurance industry. In particular, Gilmartin worked for CNA insurance company from 1950 until his retirement in 1986. *See* Declaration of William J. Gilmartin ("Gilmartin Decl."), ¶ 3. During his time at CNA, Gilmartin founded CNA's reinsurance division, where he worked in a managerial capacity until his retirement. *Id*. Gilmartin supervised many aspects of the reinsurance division, included the ceded reinsurance of CNA and CNA's participation in voluntary pools. *Id*. During the time the Certificates in this case issued – between 1969 and 1977 – Gilmartin was Vice President in charge of reinsurance assumed and reinsurance ceded. *Id*., ¶ 4. In that position, Gilmartin was responsible for purchasing both property and casualty facultative reinsurance from Gen Re and other insurers and regularly reviewed facultative certificates issued to CNA by those insurers. *Id*.

Following his retirement from CNA, Gilmartin has continued to be involved in the insurance industry, serving on the boards of several CNA companies and other reinsurance industry organizations and as acting President of the Brokers and Reinsurance Markets Association. *Id*. Gilmartin is currently Chairman of the Board of Aioi Insurance Company of American. *Id*. In addition, Gilmartin has testified as

an expert witness on reinsurance issues in numerous actions, including six separate actions in the past four years. *Id*., ¶¶ 6-7.

75. In his declaration, Gilmartin testified that the language used in Section C of the Texaco, SoCal Edison and Penn Central Certificates, providing that Gen Re is liable for "its proportion of expenses, other than Company salaries and office expenses, incurred by the Company in the investigation and settlement of claims or suits . . ." is "substantially similar to that commonly used in most facultative reinsurance certificates issued to cedents during the same period." Gilmartin Decl., ¶ 19. Similarly, Gilmartin testifies that the language used in Section D of the Oil & Solvent and Chem Trol Certificates, which provides that Gen Re is liable for "its proportion of expenses (other than office expenses and payments to any salaried employee) incurred by the Company in the investigation and settlement of claims or suits . . ." is "substantially similar to that commonly used in most facultative reinsurance certificates issued to cedents during the same period." Gilmartin Decl., ¶ 20.

76. Gilmartin testified further that "during the period from the late 1960s through the early 1980s there was an industry custom and practice of reinsurers reimbursing cedents for payment of declaratory judgment expenses under facultative reinsurance certificates including wording substantially similar to wording in Sections C and D of the Gen Re certificates." Gilmartin Decl., ¶ 39. According to Gilmartin, "[d]uring that time period, neither Gen Re, nor any other reinsurer to which CNA submitted expenses, required that CNA break out or separately identify which expenses were for defense of the original insured and which expenses related to coverage or declaratory costs. Gilmartin Decl., ¶ 25. Nor did Gilmartin recall, during this time period, "a reinsurer ever denying a claim, or any part of a claim, which CNA submitted on the basis that declaratory judgment expenses or coverage related expenses included in that claim were not covered by facultative reinsurance." *Id*. Finally, Gilmartin testified that the question of reimbursement for DJ expenses was first raised by reinsurers in the early 1980s – well after the Certificates were issued – in response to rising costs associated with asbestos and pollution claims. Gilmartin Decl., ¶ 28.

77. The Court finds that Gilmartin's testimony on custom and practice is highly credible. Gilmartin has extensive experience in the reinsurance industry and, by virtue of his employment in CNA's reinsurance department, was aware of the custom and practice during the relevant time period – not only of

CNA but also of the reinsurers to which CNA ceded risk, including Gen Re. Further, Gen Re has not identified any evidence showing that during the period when the Certificates were issued Gen Re – or indeed, any reinsurance company – denied payment under a reinsurance certificate on the basis that DJ expenses were included. Accordingly, the Court finds that at the time the Certificates issued, there was a nearly universal custom and practice in the reinsurance industry of paying DJ expenses under certificates containing language substantially the same or similar to the language contained in the Certificates here.

78. This finding is supported by the testimony of Earl C. Davis that during the time he has worked for Fireman's Fund, Fireman's Fund has paid "the vast majority" of DJ expenses sought be cedents of risk under facultative reinsurance certificates issued by Fireman's Fund. *See* Declaration of Earl C. Davis ("Davis Decl."), ¶ 7. Although Davis did not begin his employment in the insurance industry until 1976, and did not begin working for Fireman's Fund until 1985, his employment as Senior Vice President of Discontinued Operations has allowed him to gain exposure to Fireman's Fund's policies with respect the certificates issued by Fireman's Fund during the relevant period, which used language similar to that at issue here. *See* Davis Decl., ¶ 9. The Court, however, places much less weight on Davis's testimony than it does on Gilmartin's. First, Davis's testimony establishes that he is familiar only with the practices of Fireman's Fund with respect to DJ expenses, whereas Gilmartin's experience encompasses the entire industry, including Gen Re. Second, Davis has a vested interest in the outcome of this litigation and therefore is somewhat less credible as a witness than Gilmartin.

79. The testimony of Thomas S. Orr on Gen Re's practices regarding DJ expenses is not inconsistent with the above finding. Orr testified in his declaration that "[i]n the twenty-four years [he has] been employed at Gen Re, it has been Gen Re's position that DJ expenses are not covered under its facultative reinsurance certificates, unless there is specific language expressly providing coverage for DJ expenses." Declaration of Thomas S. Orr ("Orr Decl."), ¶ 25. Because Orr's employment with Gen Re began in 1981, this statement is consistent with Gilmartin's testimony that reinsurers began to question whether DJ expenses were included under reinsurance certificates such as those at issue here in the early 1980s.

80. The Court does not find credible the testimony of Gen Re's Senior Vice-President, William Thiele, that at the time the Certificates were issued, "it was the intention of involved underwriters that the

13

coverage afforded under the certificates was limited to the risk assumed by the cedent under policies issued to insureds . . . ." Thiele Decl., ¶ 16. As senior vice president of Gen Re, Thield has a strong vested interest in the outcome of this action and thus the Court finds this testimony unconvincing. In any event, this statement is both unconvincing and inadmissible for lack of personal knowledge because Thiele has not laid a factual foundation in support of his statement purporting to describe the "intention of involved underwriters."

81. Gen Re has presented evidence that during the period in which the Certificates were issued cedents and reinsurers generally did not discuss the question of whether DJ expenses were covered. *See* Revised Declaration of William E. Thiele ("Thiele Decl."), ¶ 15. Fireman's Fund has presented no evidence to the contrary. Nor is there any evidence in the record that this issue was discussed by the parties when the Certificates were issued. Accordingly, the Court finds that the issue generally was not discussed by cedents and reinsurers during the relevant period and was not discussed by the parties in this case at the time the Certificates were issued.

82. The Court finds, based on Gen Re's stipulation at trial, that until coverage is actually denied, it is the policy of Gen Re to include the cost of coverage counsel's fees and expenses for investigation as an "expense" under its facultative reinsurance certificates where a loss ultimately is incurred.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

83. This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000.00 and the parties are citizens of different states. Fireman's Fund is a California Corporation with its principal place of business in California. Gen Re is a Delaware Corporation with its principal place of business in Connecticut.

84. Venue is proper in this District because both parties are present and doing business here.

### B. Choice of Law

85. Because jurisdiction is based on diversity, the Court looks to California's choice of laws rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487(1941).

86. In contract actions in which no choice of law is specified in the contract, California courts apply the laws of the state that has the most significant relationship to the conflict. *See ABF Capital Corp.*

1  *v. Berglass*, 130 Cal. App. 4th 825, 30 Cal. Rptr. 3d 588, 596 (2005); *see also Strassberg v. New*
2  *England Mutual Life Ins. Co.*, 575 F.2d 1262, 1263 -1264 (9th Cir. 1978).  Here, Fireman's Fund
3  asserts – and Gen Re does not dispute – that California has the most significant relationship to the dispute
4  because Fireman's Fund is a California Corporation and most of the bills for DJ expenses were sent to Gen
5  Re's San Francisco office.  Accordingly, the Court applies California law.

      **C.**      **Obligation to Reimburse for Declaratory Judgment Expenses**

7        87.      Under California law, insurance contracts are subject to the same basic rules of
8  construction as other contracts.  *Montrose Chemical Corp. v. Admiral Ins. Co.,* 10 Cal. 4th 645, 666
9  (1995).  California's statutory rules of contract interpretation provide that the mutual intentions of the
10 parties at the time the contract was formed govern interpretation.  *Id.* (citing Cal. Civ. Code § 1636).
11 Intent is to be inferred, if possible, solely from the written terms of the contract.  *Id*.

12       Generally, words in a contract are to be construed according to their plain and ordinary meaning.
13 *Hayter Trucking, Inc. v. Shell Western E & P Inc.*, 18 Cal. App. 4th 1, 15 (1993).  "However,
14 particular expressions may, by trade usage, acquire a different meaning in reference to the subject matter of
15 a contract.  If both parties are engaged in that trade, the parties to the contract are deemed to have used
16 them according to their different and peculiar sense as shown by such trade usage and parol evidence is
17 admissible to establish the trade usage even though the words in their ordinary or legal meaning are entirely
18 unambiguous." *Id.*; *see also Larwin-Southern California, Inc. v. JGB Investment, Inc.*, 101 Cal. App.
19 3d 626, 635 (1979) (noting that "custom and usage . . . may properly be used in clarifying what, on the
20 face of a contract, appears to be an ambiguity"). "The knowledge [of trade usage] may be actual or
21 constructive, and it is constructive if the custom is of such general and universal application that the party
22 must be presumed to know of it." *Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuit, Inc.* 59
23 Cal. App. 3d 948, 956-957  (1976).
24 "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it
25 appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant
26 to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & E.*
27 *Co. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968).

28

88. The disputed language in this case, found in Section C of the Texaco, SoCal Edison and Penn Central Certificates and in Section D of the Oil & Solvent and Chem Trol Certificates, provides for coverage of "expenses" incurred in the "investigation and settlement of claims or suits." The Court finds that this language can reasonably be read as either covering DJ expenses or excluding them. The court agrees with the court in *Affiliated FM Ins. Co. v. Constitution Reins. Corp.* that:

> "Expenses" is a word of broad import. It has no fixed definition. It is of varying signification and is dependent for its precise meaning upon its connection and the purpose to be accomplished by its use. It is comprehensive enough to include a wide range of disbursements. Standing alone, it is ambiguous.

416 Mass. 839, 844 (quoting *Pittsfield & N. Adams R.R. v. Boston & Albany R.R.*, 260 Mass 390, 397 (1927)). In *Affiliated FM*, the plaintiff sought coverage for DJ expenses under a facultative reinsurance certificate that contained language virtually identical to the language at issue here. In particular, the certificate covered "expenses [other than office expenses and payments to any salaried employee] incurred by the Company in the investigation and settlement of claims or suits . . . ." *Id*. at 880 n. 4. The Massachusetts Supreme Court held that the language was ambiguous, reversing a lower court decision granting summary judgment in favor of the reinsurer. *Id*. at 844. Accordingly, the case was remanded for consideration of evidence of custom and usage to determine the meaning of the ambiguous language.

89. In the face of ambiguous language, and in the absence of any contemporaneous evidence of the parties' intentions, the Court looks to the custom and practice in the industry at the time the Certificates were issued to "arrive at an interpretation which appears to be in accord with justice and common sense and the probable intentions of the parties." *Affiliated FM*, 416 Mass. at 846 (citation omitted). Based on the Court's finding that at the time the Certificates were issued there was a widespread custom and practice among reinsurers, including Gen Re, of paying DJ expenses under facultative reinsurance certificates containing language similar to or the same as the language at issue here, the Court concludes that the disputed language covers the DJ expenses sought by Fireman's Fund in this case.

90. This construction is consistent with Gen Re's policy of including coverage counsel as an "expense" until coverage is denied where a loss is ultimately incurred. The cost of coverage counsel is similar to DJ expenses to the extent that both are expenses that go beyond the risk assumed in the

underlying policies and are incurred in connection with the threshold determination of whether the insurer is obliged to afford coverage under the policy.

91. The Court's interpretation is also consistent with common sense and the principles of reinsurance. In particular, insurers and reinsurers owe each other a duty of "utmost good faith." *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993). In light of the common interest of the cedent and reinsurer in the outcome of DJ actions, it makes little sense to draw a distinction between DJ expenses and other types of expenses. Indeed, such a distinction might well create a disincentive for cedents to challenge coverage on the part of the insured in a DJ action, potentially to the detriment of both the reinsurer and the cendent. *See Employers Ins. Co. of Wasau v. American Re-Insurance Co.*, 256 F. Supp. 923, 926 (W.D. Wisc. 2003).

92. The Court rejects Gen Re's contention that custom and usage should not be considered because the custom and usage of paying DJ expenses was not "knowing." Where a custom and usage is essentially universal, as the evidence shows it was here, a party is presumed to have knowledge of it. *See Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuit, Inc.* 59 Cal. App. 3d 948, 956-957 (1976); Restatement (Second) of Contract § 221 com. b (stating that "[t]he more general and well-established a usage is, the stronger is the inference that a party knew of or had reason to know of it"). Such constructive knowledge, by itself, provides a sufficient basis on which to conclude that the word "expenses" includes DJ expenses.[3]

93. The Court rejects Defendant's assertion that Gilmartin's deposition testimony constitutes an acknowledgment that the practice of paying DJ expenses was not knowing. In his deposition, Gilmartin was asked whether payment of DJ expenses by Gen Re during the relevant period could be knowing, in light of his testimony that cedents did not itemize DJ expenses in their bills to reinsurers. *See* Gilmartin Depo. at 27 - 30. Gilmartin responded that he would only agree that payment of such expenses was *not*

---

[3] Although the Court need not reach the question, the Court also concludes that, as a factual matter, Gen Re had *actual* knowledge of the custom and practice. As Gen Re itself notes, "[t]he parties to the Certificates are large, sophisticated business entities very familiar with the business of reinsurance." Pretrial Brief of Gen-Re Reinsurance Corporation ("Gen-Re Pretrial Brief") at 5. It simply is not credible that reinsurers were unaware for decades that they were paying DJ expenses along with their share of the loss, especially in light of the fact that where a DJ action has been filed, settlement and investigation of the underlying claims can *only* occur within the context of the DJ action. *See* Davis Decl., ¶ 10.

knowing if he saw evidence that a DJ expense had been denied by a reinsurer and he had seen no such evidence. Further, he noted, "it's impossible for me to believe that [no DJ expenses] were presented." *Id*. at 30. Far from admitting that DJ expenses were not knowingly paid, Gilmartin's testimony supports the conclusion that Gen Re had constructive knowledge (if not actual knowledge) of the custom and usage in the industry.

94.  This case is distinguishable from *British Int'l Ins. Co. Ltd. v. Seguros Republica, S.A.*, 342 F.3d 78 (2d Cir. 2003), in which the court concluded that the language contained in the reinsurance certificates unambiguously *did not* cover DJ expenses. There, the language was significantly different from the language here. In particular, it did not refer to "expenses." Instead, the cedent sought to recover DJ expenses under language providing that "[t]his Certificate of Reinsurance is subject to the same risks, valuations, conditions and endorsements . . . as are or may be assumed by the reinsured, and loss, if any, hereunder is payable pro rata with the reinsured and at the same time and place . . ." 342 F.3d at 80. The court reasoned that the cedent in that case had not demonstrated that there was any ambiguous term – that is – a term that could reasonably be read to suggest more than one meaning. *Id*. at 83. The court distinguished *Affiliated FM* on the basis that in that case, the word "expenses" was susceptible to more than one meaning. *Id*. at 83.

The court in *Seguros* went on to address whether the evidence of custom and usage was sufficient to find an implied term in the contract requiring the reinsurer to pay DJ expenses. *Id*. The court found that it was not, rejecting testimony by the same expert who has testified in this case – William Gilmartin – of custom and usage. Gilmartin testified in that case that "between 1976 and 1983, "[i]t was the custom and practice for reinsurers to pay [their reinsureds' declaratory judgment] expenses due to the common interest they shared with their reinsureds arising from the defense or prosecution of a declaratory judgment action." *Id*. at 84. The Second Circuit found Gilmartin's testimony unpersuasive, concluding the plaintiff had not established actual or constructive knowledge of the alleged custom and usage. *Id*. Specifically, the court pointed to three shortcomings in the evidence: 1) "Gilmartin did not aver . . . that these . . reinsurers always and invariable paid these costs . . . and his testimony can be read to say that the payments were made *ex gratia* when reinsurers believed that the coverage litigations advanced their common interest, but not otherwise"; 2) Gilmartin did not testify that the language contained in the reinsurance certificates issued by

other reinsurers was similar to the language in the certificates at issue in that case; and 3) there was "no allegation of actual or constructive knowledge" on the part of the reinsurer or evidence that the practice was "so notorious" in the industry that the reinsurer must have been aware of it. *Id*

This Court places greater weight on Gilmartin's testimony than did the *Seguros* court for three reasons. First, Gilmartin's declaration in this action cannot reasonably be read to say that reinsurers only paid DJ expenses when it suited their interests. To the contrary, Gilmartin states that in all of his decades of experience in the reinsurance industry, he is unaware of a single instance in which a reinsurer denied DJ expenses to a cedent. Thus, the possibility that a reinsurer might have done so is sheer speculation. Second, in this case, in contrast to *Seguros*, Gilmartin has clearly stated that his opinion concerning the custom and practice of other reinsurers is based on his experience regarding payment of DJ expenses under facultative reinsurance certificates containing the same or similar language to that at issue here. Finally, the evidence offered by Gilmartin that he never encountered a single instance in which DJ expenses were denied under similar language is sufficient to establish constructive knowledge based on a notorious custom and usage in the industry.

### D. Statute of Limitations

95. Where a written contract between the parties does not specify when payment is due, the breach does not occur upon the making of demand for payment but rather, at the expiration of a reasonable time. *Caner v. Owners Realty Co.*, 33 Cal. App. 479, 481 (1917). The question of what is a reasonable time is a fact question to be determined based on the particular circumstances of the case. *Hoppin v. Munsey*, 185 Cal. 678, 684 (1921).

96. The statute of limitations for breach of a written contract is four years. Cal. Civ. Proc. Code § 337.

97. Here, the Court considers the ongoing discussions between Fireman's Fund and Gen Re concerning possible settlement of the outstanding DJ expenses, the common practice among reinsurers of paying cedents after long delays, and the fact that Gen Re did not expressly refuse to pay the disputed amounts until March 2003. Considering these circumstances, the Court concludes that a reasonable time for accrual from the time of billing is no less than four years. The earliest invoice was received by Gen Re on December 17, 1996. Thus, the cause of action accrued no sooner than December 17, 2000. Because

1 this action was filed on September 30, 2003, within four years of that date, Fireman's Fund's claim for DJ
2 expenses is timely as to all disputed amounts.

### E. Liability

98. Gen Re is liable to Fireman's Fund in the amount of $238,282.65, the agreed amount of the Texaco, SoCal Edison, Penn Central, Oil and Solvent and Chem Trol DJ expenses.

99. In addition, Gen Re is liable to Fireman's Fund for prejudgment interest pursuant to Cal. Civ. Code § 3289.

## IV. CONCLUSION

The parties are instructed to meet and confer on the question of the amount of prejudgment interest to which Fireman's Fund is entitled and submit a stipulation as to that amount. In the event the parties are unable to agree on the amount of prejudgment interest, a telephonic case management conference will be conducted on **August 19, 2005, at 1:30 p.m.**, to discuss what further briefing may be necessary to resolve that issue.

IT IS SO ORDERED.

Date: August 5, 2005



JOSEPH C. SPERO
United States Magistrate Judge